**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

TIMOTHY M.,[1]

                              Plaintiff,                    1:20-cv-310 (BKS)

v.

KILOLO KIJAKAZI,[2] Acting Commissioner of Social
Security,

                              Defendant.

---

**Appearances:**

*For Plaintiff:*
Charles E. Binder
Law Office of Charles E. Binder and Harry J. Binder, LLP
485 Madison Avenue, Suite 501
New York, NY 10022

*For Defendant:*
Antoinette T. Bacon
Acting United States Attorney
Hugh Dun Rappaport
Special Assistant United States Attorney
Social Security Administration
Office of the General Counsel
J.F.K. Federal Building, Room 625
Boston, MA 02203

---

[1] In accordance with the local practice of this Court, Plaintiff's last name has been abbreviated to protect his privacy.

[2] Pursuant to Fed. R. Civ. P. 25(d), the current Acting Commissioner of Social Security, Kilolo Kijakazi, has been substituted in place of her predecessor, Commissioner Andrew Saul.

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.       INTRODUCTION

Plaintiff Timothy M. filed this action under 42 U.S.C. § 405(g) seeking review of a

decision by the Commissioner of Social Security (the "Commissioner") denying Plaintiff's

application for Social Security Disability Insurance ("SSDI") Benefits. (Dkt. No. 1). The parties'

briefs, filed in accordance with N.D.N.Y. General Order 18, are presently before the Court. (Dkt.

Nos. 13, 17, 20). After carefully reviewing the Administrative Record,[3] (Dkt. No. 11), and

considering the parties' arguments, the Court affirms the Commissioner's decision.

## II.       BACKGROUND

### A.       Procedural History

Plaintiff applied for SSDI benefits on May 8, 2014, alleging disability due to a variety of

physical and mental impairments, including depression, post-traumatic stress disorder ("PTSD"),

chronic alcoholism, chronic hepatitis C, cognitive and behavioral issues, spinal stenosis, anger

problems, and anxiety. (R. 360–63; *see* R. 378). Plaintiff alleged a disability onset date of August

1, 2009, (R. 360), through his date last insured ("DLI") of September 30, 2012, (*see* R. 303). The

Commissioner denied Plaintiff's claim on June 10, 2014. (R. 303). Plaintiff appealed that

determination, and a hearing was held before Administrative Law Judge ("ALJ") Mark Hecht on

February 24, 2016, at which Plaintiff was represented by counsel. (R. 258–96). On March 11,

2016, ALJ Hecht issued a decision finding that Plaintiff was not disabled within the meaning of

the Social Security Act. (R. 11–17). Plaintiff filed a request for review of that decision with the

Appeals Council, which denied review on October 13, 2017. (R. 1–7).

---

[3] The Court cites to the Bates numbering in the Administrative Record, (Dkt. No. 11), as "R." throughout this opinion, rather than to the page numbers assigned by the CM/ECF system.

On December 13, 2017, Plaintiff filed a civil action in the United States District Court for the Southern District of New York. (*See* R. 974–77). The parties stipulated to remand the matter to the Commissioner for further proceedings, which the Honorable Katherine B. Forrest ordered on August 1, 2018. (R. 969–70). On February 8, 2019, the Appeals Council ordered the matter remanded for a new hearing and decision by an ALJ. (R. 964–66).

A second hearing was held before ALJ Mary Sparks on May 15, 2019, at which Plaintiff was represented by counsel. (R. 915–61). On July 24, 2019, ALJ Sparks issued a decision finding that Plaintiff was not disabled under the Social Security Act. (R. 895–905). Plaintiff filed a request for review of that decision with the Appeals Council, which denied review on February 12, 2020. (R. 875–81). Plaintiff commenced this action on March 18, 2020. (Dkt. No. 1).

### B.    Plaintiff's Background and Testimony

Plaintiff was born in 1958 and was 51 years old at the alleged onset of his disability and 54 years old at the time of the DLI. (R. 919). He has a high school education and past relevant work as a carpenter, protective signal installer, and electrician. (R. 919, 954–55). Plaintiff, who has not worked since the alleged onset date, testified that he stopped working because of "physical problems" and because he became "very ill" after he started treatment for hepatitis C in 2007. (R. 919, 925). Plaintiff did not complete this first attempt at treatment for his hepatitis C; however, he later successfully completed treatment in May 2009, and his hepatitis C has been in remission since then. (R. 927–29; *see* R. 428).

Plaintiff was incarcerated from July 2010 to July 2012, (*see* R. 268), and he testified that while in custody he was assigned to maintenance work details and assisted an instructor with teaching students how to read electrical diagrams, (R. 930–31). Plaintiff also testified that he was on psychotropic medications while incarcerated. (R. 931). Upon release, he was required to seek substance abuse counseling as a term of his parole. (R. 932).

With regard to mental health issues, Plaintiff testified that, during the relevant time period, he was "paranoid" and "fearful all the time," and that he "[did not] go out and do things unless [he] ha[d] to." (R. 935). Plaintiff testified that he suffered from panic attacks, agoraphobia, and depression during the relevant time period. (R. 939–42). After being released from prison, Plaintiff lived with his girlfriend in New York City and shortly thereafter started treatment at Saint Mark's Institute for Mental Health ("St. Mark's"). (R. 936–38).  Plaintiff also testified to difficulties with focus and concentration and anger issues. (R. 945, 948).

## C.    Mental Health Evidence[4]

### 1.    Letters from Providers

The record contains letters from certain providers indicating that Plaintiff received some form of treatment from them. In a letter dated April 23, 2016, James C. Craig, M.D., stated that he treated Plaintiff from 2005 to 2010, and that Plaintiff "battled alcoholism, anxiety and hepatitis C." (R. 1350). Dr. Craig stated that Plaintiff's conditions "affected his ability to obtain and maintain employment" and noted that the conditions dated back to a visit on September 9, 2005 and continued through February 22, 2010. (*Id.*).

In a letter dated March 29, 2016, Sherry Gonyea-McElroy, M.S., stated that Plaintiff "was in the PSAP/[Mentally Ill Chemically Addicted ("MICA")[5]] Treatment Program at Transitional Services Association, Inc. from 12/31/08-9/24/09 for dually diagnosed individuals with mental illness and chemical addiction." (R. 1347, 1349). On April 20, 2016, Felicia Pirrone, a MICA counselor, also submitted a letter stating that Plaintiff's treatment included individual counseling, Alcoholics Anonymous meetings, group therapy, and Day Treatment. (R. 1349).

---

[4] The Court has not addressed the record evidence regarding Plaintiff's physical impairments, as Plaintiff does not dispute the ALJ's findings regarding those impairments. (Dkt. No. 13, at 3 n.5). Additionally, in light of Plaintiff's DLI, the Court focuses primarily on record evidence pertinent to the relevant time period.

[5] The record does not define "PSAP."

None of the above individuals provided any further details or treatment records.

### 2.      New York State Department of Correctional Services

The administrative record contains records from the New York State Department of Correctional Services that span approximately from August 2010 to June 2012, during the period Plaintiff was incarcerated. (*See* R. 438–75). As to Plaintiff's mental impairments, the records mention depression and anxiety, (R. 473), and indicate that Plaintiff was on medications including Effexor and Buspar, which are used to treat depression and anxiety, (*e.g.*, R. 440).

### 3.      St. Mark's Institute for Mental Health

Plaintiff became a patient of St. Mark's on July 17, 2012. (*See* R. 478). Giovanny Nunez, M.D., conducted an initial evaluation and mental status examination of Plaintiff on August 8, 2012. (R. 618–28). Dr. Nunez's records indicate that Plaintiff started treatment at St. Mark's as a condition of his parole. (R. 622 (quoting Plaintiff as stating "I have to do a substance abuse program for parole")). Plaintiff reported to Dr. Nunez that he had a history of PTSD "from seeing a girl dying in his arms in 1982, and having been assaulted several times." (*Id.*). Plaintiff was currently on Effexor and Buspar and reported feeling "'confused', anxious, tense, depressed." (*Id.*). Plaintiff denied suicidal or homicidal ideation and had no psychotic symptoms. (*Id.*). Dr. Nunez assigned Plaintiff a primary diagnosis of alcohol dependence and secondary diagnoses of PTSD and nicotine dependence. (R. 623). Other than noting Plaintiff had depressed mood, the results of Dr. Nunez's mental status examination were all within normal limits. (R. 626–28).

Plaintiff returned to see Dr. Nunez on September 5, 2012. (R. 629). Dr. Nunez reported that Plaintiff was "doing better" and felt his medication was "working for him." (*Id.*). On October 5, 2012, Dr. Nunez reported that Plaintiff was "doing well," although he complained of "sexual side effects with Effexor" and requested a switch to Wellbutrin. (R. 634).

On November 6, 2012, Plaintiff saw Benjamin Buckholts, M.D. (R. 639–43). Dr. Buckholts reported that Plaintiff was "still anxious, depressed, angry, incapable to control any emotion. Irritable and easily provoked." (R. 639). On December 27, 2012, Dr. Nunez reported that Plaintiff's "mood [was] brighter, calm, cooperative, in good control of behavior." (R. 659).

Plaintiff's first documented visit with Mark Rybakov, D.O., was on February 2, 2013. (R. 669–75). The treatment note from this visit indicates that Plaintiff reported his mood to be "slightly depressed" and that he was having trouble sleeping. (R. 669). On March 2, 2013, Dr. Rybakov noted that Plaintiff was "doing well overall" and that his "sleep ha[d] improved," although Plaintiff spoke about "people being aggressive" and had "some antisocial traits." (R. 676). Plaintiff continued to see Dr. Rybakov through at least September 26, 2016. (*See generally* R. 681–830, 1127–31, 1291–1324).

### 4.    The Second Wind, Inc.

Plaintiff was first evaluated by John Bliss, LCSW, of The Second Wind, Inc. on October 15, 2012. (*See* R. 482–91). At that time, Mr. Bliss described Plaintiff's presenting problem as "extensive drug/alcohol history." (R. 482). Mr. Bliss listed Plaintiff's diagnoses as recurrent major depressive disorder, alcohol dependence, and PTSD. (R. 491). Mr. Bliss also performed a mental status examination, and all of the results were within normal limits. (R. 489–90). Mr. Bliss recommended that Plaintiff attend weekly individual counseling sessions. (R. 491).

The record indicates that Plaintiff continued to see Mr. Bliss regularly, approximately once a week, through June 2018. (*See generally* R. 531–52, 595–603, 831–36, 851–52, 860–62, 1268–73; *see* R. 1506 (referring to date of most recent exam as June 25, 2018)). Dr. Bliss's treatment notes record Plaintiff's history and contemporaneous use of alcohol and other drugs, and document some of the symptoms and issues Plaintiff struggled with over the course of their treating relationship. (*E.g.*, R. 492–93 (agoraphobia and depression), R. 515 ("forgets things[;]

gets lost in the city"), 516 (noting Plaintiff's mental health was "stable" but that he was "not functioning at a high level at this time"), 531 (noting a "rough history" of addiction to all types of drugs, primarily alcohol), 544 (anger management), 546 ("agitated angry difficulty focusing"), 548 (noting that Plaintiff resumed drinking and smoking after his father died)).

### D.   Opinion Evidence

#### 1.   Dr. Mark Rybakov (Treating Physician)

On November 19, 2015, Dr. Rybakov completed a Mental Impairment Questionnaire. (R. 853–57). Dr. Rybakov listed Plaintiff's diagnoses as PTSD, major depressive disorder, and alcohol dependence in full remission. (R. 853). Dr. Rybakov checked off the signs and symptoms which supported his assessment of Plaintiff, including depressed mood, persistent or generalized anxiety, difficulty thinking or concentrating, poor memory, and paranoia. (R. 854). Dr. Rybakov opined that Plaintiff had "moderate-to-marked" and "marked" limitations with respect to understanding and memory, concentration and persistence, social interactions, and adaptation, but that he was only moderately limited in his ability to "[a]dhere to basic standards of neatness." (R. 856). Dr. Rybakov further opined that Plaintiff "is not capable to work at present" and stated that Plaintiff has "persistent symptoms" despite treatment. (R. 857). Dr. Rybakov stated that the symptoms and limitations detailed in the questionnaire "appl[ied] as far back as" August 1, 2009, Plaintiff's alleged onset date. (*Id.*).

On November 15, 2016, Dr. Rybakov completed a second Mental Impairment Questionnaire. (R. 1325–29). Dr. Rybakov's assessment of Plaintiff's symptoms and limitations is substantially the same as it was in his November 2015 opinion. (*Compare* R. 1325–29, *with* R. 853–57). In this second questionnaire, Dr. Rybakov stated that the symptoms and limitations detailed therein applied as far back as March 12, 2016. (R. 1329).

## 2.    John Bliss, LCSW (Plaintiff's Therapist) [6]

Mr. Bliss prepared and submitted numerous statements and opinions regarding Plaintiff's limitations. On August 22, 2014, Mr. Bliss completed a Mental Impairment Questionnaire opining that Plaintiff was not able to work at all. (R. 589–93). Mr. Bliss listed Plaintiff's diagnoses as major depressive disorder with psychotic features and PTSD. (R. 589). Mr. Bliss based his assessment of Plaintiff on numerous signs and symptoms, including depressed mood, persistent or generalized anxiety, and difficulty thinking or concentrating. (R. 590). Mr. Bliss found in the area of "Social Interactions" that Plaintiff had no limitations in his ability to "[a]sk simple questions or request assistance" or "[a]dhere to basic standards of neatness," but found that Plaintiff otherwise had "moderate-to-marked" or "marked" limitations with respect to "Social Interactions" or "Adaptation," and "marked" limitations with respect to understanding and memory, as well as concentration and persistence. (R. 592). The questionnaire states that these symptoms and limitations applied as far back as January 1, 2007. (R. 593). Mr. Bliss also stated that Plaintiff "becomes very disorganized." (*Id.*).

In a letter dated July 22, 2014, Mr. Bliss stated that Plaintiff was being treated for PTSD and recurring major depression, and that he had symptoms of agoraphobia and amnestic disorder. (R. 612). Mr. Bliss noted Plaintiff's "severe challenges in everyday functioning." (*Id.*). The letter contains the results of a mental status examination, which included constricted affect, depressed mood, slow speech pattern, impaired attention/concentration, impaired short-term memory, and impaired long-term memory. (R. 614–15).

---

[6] Most of the opinion evidence from Mr. Bliss is co-signed by Ben Cheney, M.D. The record does not indicate that Dr. Cheney had a treating relationship with Plaintiff, and Plaintiff references Dr. Cheney only briefly in his statement of facts. For simplicity, the Court refers to this evidence as the opinions of Mr. Bliss.

On November 16, 2015, Mr. Bliss completed a second Mental Impairment Questionnaire. (R. 837–41). Mr. Bliss reported that Plaintiff "ha[d] steadily gotten worse as his physical challenges exacerbate." (R. 839). In this opinion, Mr. Bliss stated that Plaintiff had a "none-to-mild" limitation in one mental activity ("Adhere to basic standards of neatness") but "marked" limitations in every other area. (R. 840). The questionnaire states that the symptoms and limitations expressed therein applied as far back as August 1, 2009. (R. 841).

Mr. Bliss prepared a third Mental Impairment Questionnaire on September 16, 2016. (R. 1280–84). The opinions expressed in this questionnaire are substantially similar to those in the previous two questionnaires. Moreover, Mr. Bliss states that the symptoms and limitations expressed in this questionnaire applied as far back as October 16, 2012 "when I met [Plaintiff]." (R. 1284).

On March 8, 2019, Mr. Bliss completed a Psychiatric/Psychological Impairment Questionnaire. (R. 1506–10). On this occasion, Mr. Bliss opined that Plaintiff had "marked" limitations in twenty-one mental activities, a "moderate" limitation in one mental activity ("Sustain ordinary routine without supervision"), and a "mild-to-none" limitation in one activity ("Adhere to basic standards of neatness"). (R. 1509). Mr. Bliss stated that the symptoms and limitations applied as far back as June 1, 2007, writing: "I didn't know him at that time but history indicates that he was disabled at that time." (R. 1510). Mr. Bliss further opined: "There is no question that [Plaintiff] is entitled [and] needs full disability benefits." (*Id.*).

The record also contains letters by which Mr. Bliss opined that Plaintiff "is totally disabled without consideration of any past or present and/or alcohol use. Drug and/or alcohol use is not a material cause of this individual's disability." (R. 587 (letter dated August 20, 2014), 1286 (letter dated September 15, 2016)).

### 3.  Dr. Ronald Sherman (Evaluating Psychologist)

Ronald A. Sherman, Ph.D., evaluated Plaintiff on September 18, 2016. (R. 1288–90). In a letter summarizing the evaluation, Dr. Sherman asserted: "The onset of [Plaintiff's] homicidal ideation without plan, wish, intent, impulse control issues, irritability, hostility, agitation, emotional lability, mood disturbance, personality change, depression, anxiety, blunt, flat or inappropriate affect, paranoia/suspiciousness, diminished frustration tolerance, insomnia, nightmares, anhedonia, feelings of guilt/worthlessness, withdrawal/isolation, appetite disturbance with weight change, panic and substance dependence were first in evidence 8/1/2009." (R. 1288). Plaintiff "volunteered" his history of substance abuse, and Dr. Sherman opined that Plaintiff's history of drug use "was not a material cause of this disability." (R. 1289). Dr. Sherman's letter also recounts Plaintiff's reported history of psychiatric treatment, including his current treatment with Dr. Rybakov and Mr. Bliss. (*Id.*). Plaintiff reported "impulse control issues," homicidal ideation, and "hostility and irritability." (*Id.*). Dr. Sherman included the results of a mental status examination, including being alert and oriented and having clear speech, depressed mood, labile affect, fair concentration and attention to detail, and fair insight and judgment. (R. 1290). Dr. Sherman listed Plaintiff's diagnoses, which included bipolar disorder, intermittent explosive disorder, history of polysubstance abuse/dependence, alcohol dependence, antisocial personality disorder, and hepatitis C. (*Id.*). Dr. Sherman concluded: "Plaintiff was totally disabled emotionally and unable to function in any job in any capacity. Substance abuse including alcohol and/or drugs was not a contributing factor. The present degree of severity of his mental illness has existed since 8/1/2009." (*Id.*).

Dr. Sherman also completed a Mental Impairment Questionnaire on September 18, 2016, which reiterates the findings of his evaluation. (R. 1274–78). Dr. Sherman opined that Plaintiff had "none-to-mild" and "moderate" limitations in understanding and memory; "marked"

10

limitations in concentration and persistence, except for a "none-to-mild" limitation in carrying

out "simple, one-to-two step instructions" and a "moderate" limitation in making simple work-

related decisions; and "moderate-to-marked" and "marked" limitations in the areas of social

interactions and adaptation. (R. 1277). Dr. Sherman again concluded that Plaintiff was totally

disabled and that his limitations applied as far back as August 1, 2009. (R. 1278).

### 4.    Cherie Plante (Vocational Expert)

At the hearing on May 15, 2019, the ALJ called Cherie Plante, a vocational expert

("VE"), to testify. (R. 955–60). The VE testified that a person of Plaintiff's age, education, and

work experience who was limited to work at the "light" exertional level but who was limited to

"performing jobs that required no more than occasional interaction with the public, and required

no tandem tasks with coworkers" could not perform any of Plaintiff's past relevant work. (R.

956). She further testified that such a hypothetical person could perform the jobs of router

(*Dictionary of Occupational Titles* ("*DOT*") Code 222.587-038), classifier (*DOT* Code 361.687-

014), and marker (*DOT* Code 209.587-034). (R. 956). She also testified that if the hypothetical

person were further limited "to performing simple, repetitive jobs defined as those having no

more than one to two tasks, as defined by the U.S. Department of Labor Employment and

Training Administration in the Revised Handbook for Analyzing Jobs" in "low stress jobs,

defined as those having no more than occasional decision making required, and no more than

occasional changes in the work setting" with "no more than occasional interaction with

coworkers" and no working "in tandem with coworkers," that person would still be able to

perform the jobs of router, classifier, and marker. (R. 957–58).

### E.    The ALJ's Decision Denying Benefits

ALJ Sparks issued a decision dated July 24, 2019, and determined that Plaintiff was not

disabled under the Social Security Act. (R. 895–905). After finding, as an initial matter, that

Plaintiff met the insured status requirements of the Social Security Act through September 30, 2012, (R. 897), the ALJ used the required five-step evaluation process to reach her conclusion.[7]

At step one, the ALJ determined that Plaintiff had not engaged in any substantial gainful activity between his alleged onset date of August 1, 2009, through his DLI of September 30, 2012 ("the relevant time period"). (*Id.*). At step two, the ALJ determined that Plaintiff had the following severe impairments under 20 C.F.R. § 404.1520(c): "history of cervical spine fusion; posttraumatic stress disorder (PTSD); depression; alcohol abuse disorder; history of polysubstance abuse, in remission." (*Id.*). The ALJ noted references in the record to hepatitis C, mild to moderate sensorineural hearing loss, and lumbar spine impairments but found that these impairments were either nonsevere or not medically determinable. (R. 897–98).[8]

At step three, the ALJ found that Plaintiff "did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (R. 898 (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526)).[9]

---

[7] Under the five-step analysis for evaluating disability claims:

> [I]f the Commissioner determines (1) that the claimant is not working, (2) that he has a severe impairment, (3) that the impairment is not one listed in Appendix 1 of the regulations that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do.

*Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008) (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)) (internal quotation marks and punctuation omitted). "The claimant bears the burden of proving his or her case at steps one through four," while the Commissioner bears the burden at the final step. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).

[8] Plaintiff does not challenge the ALJ's findings at step two.

[9] Plaintiff does not challenge the ALJ's finding at step three that his impairments do not meet or medically equal the severity of a listed impairment.

The ALJ proceeded to determine Plaintiff's residual functional capacity ("RFC")[10] and found that, through his DLI, Plaintiff had the RFC "to perform light work as defined in 20 CFR 404.1567(b)." (R. 899). Additionally,

> he would have been limited to simple, repetitive jobs involving no more than one or two tasks [as defined by the U.S. Department of Labor's "Revised Handbook for Analyzing Jobs"]; he could perform "low stress" work, defined as having no more than occasional decision-making required or occasional changes in the work setting; he could tolerate occasional interaction with the public or coworkers, but could not work in tandem with coworkers.

(R. 899–900). In making this determination, the ALJ followed a two-step process by which she first determined "whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the claimant's pain or other symptoms," and then evaluated "the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities." (R. 900).

Applying this two-step process, the ALJ found that while the "claimant's medically impairments could reasonably be expected to cause the alleged symptoms," "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (*Id.*). In coming to this determination, the ALJ considered the medical opinions in the record from Dr. Rybakov, Mr. Bliss, and Dr. Sherman. (*See* R. 902–03).

The ALJ first determined that, although Dr. Rybakov was a treating provider, his November 2015 opinion was entitled to "little weight" because "it [was] not supported by the

---

[10] The regulations define residual functional capacity as "the most [a claimant] can still do despite" his limitations. 20 C.F.R. § 404.1545(a)(1).

record." (R. 902). The ALJ pointed to inconsistencies between Dr. Rybakov's opinion finding

many marked limitations and the record evidence from the relevant time period showing that

Plaintiff entered treatment at St. Mark's as a condition of his parole, the fact that Plaintiff

responded positively to treatment from Dr. Nunez through September 2012, and a mostly normal

mental status examination performed by Dr. Nunez. (*Id.*). The ALJ also considered Dr.

Rybakov's November 2016 opinion but found it was entitled to "no weight" because the opinion

expressly indicated that the limitations it contained applied as far back as March 12, 2016. (*Id.*).

The ALJ next considered the opinions from Mr. Bliss and concluded that his opinion was

entitled to "little weight," as "it ha[d] no probative value in determining [Plaintiff's] work-related

limitations through the date last ensured." (R. 902–03). The ALJ's reasons for this determination

were that Mr. Bliss did not start treating Plaintiff until after the DLI, there is no indication that

Mr. Bliss reviewed any other medical evidence prior to his evaluation, Mr. Bliss relied on

Plaintiff's self-report, and Mr. Bliss's initial evaluation indicated a presenting problem of

"extensive drug/alcohol history" and a mostly normal mental status examination. (*Id.*).

Finally, the ALJ considered the September 18, 2016 report from evaluating psychologist

Dr. Sherman and concluded that it was entitled to "no weight" because it was based on a "single

examination of the claimant approximately four years after the date last insured." (R. 903).

Moreover, the ALJ reasoned that Dr. Sherman obtained Plaintiff's medical history "completely

through subjective accounting" by Plaintiff and there is no indication that Dr. Sherman "had the

opportunity to personally review any medical evidence, particularly through the date last

insured." (*Id.*). The ALJ therefore determined that Dr. Sherman had "no medical basis on which

to reach" the conclusion that Plaintiff's limitations applied as far back as August 1, 2009. (*Id.*).

At step four, having determined Plaintiff's RFC and relying on the testimony of the VE, the ALJ determined that Plaintiff was unable to perform any past relevant work through his DLI. (R. 904).

At step five, relying on the VE's testimony, the ALJ found that "[t]hrough the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed." (R. 904). These occupations included router, classifier, and marker. (R. 905). Accordingly, the ALJ found Plaintiff was "not disabled" at any time during the relevant period. (*Id.*).

## III.   DISCUSSION

### A.   Standard of Review

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine de novo whether Plaintiff is disabled. Rather, the Court must review the administrative record to determine whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). "Substantial evidence is 'more than a mere scintilla.' It means such *relevant* evidence as a *reasonable* mind might accept as adequate to support a conclusion." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 447–48 (2d Cir. 2012) (per curiam) (quoting *Moran*, 569 F.3d at 112). The substantial evidence standard is "very deferential," and the Court may reject the facts that the ALJ found "only if a reasonable factfinder would *have to conclude otherwise*." *Id.* at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)). The Court, however, must also determine whether the ALJ applied the correct legal standard. *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999). "'Where an error of law has been made that might have affected the disposition of the case, this court cannot fulfill

its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ.'" *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (quoting *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 n.3 (11th Cir. 1982)). The Court reviews de novo whether the correct legal principles were applied and whether the legal conclusions made by the ALJ were based on those principles. *See id.*; *see also Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).

**B.      Analysis**

Plaintiff argues that the ALJ erred by: (1) failing to properly weigh the medical opinion evidence and properly determine Plaintiff's RFC; (2) failing to properly evaluate Plaintiff's subjective statements; and (3) failing to reconcile apparent conflicts between the VE's testimony and the *DOT*. (Dkt. No. 13, at 16–27).

### 1.      Medical Opinion Evidence and Plaintiff's RFC

Plaintiff argues that the ALJ erred in discounting the opinions of Dr. Rybakov, Social Worker Bliss, and Dr. Sherman, and that the ALJ failed to adequately support her RFC determination. (*Id.* at 16–22). Defendant responds that the ALJ gave good and well-supported reasons for the weights she gave to the opinions and that the ALJ did not improperly substitute her own judgment when determining Plaintiff's RFC. (Dkt. No. 17, at 4–18).

#### a.      Dr. Rybakov

Plaintiff argues that the ALJ erred in failing to give the opinions of Dr. Rybakov controlling weight under the treating physician rule and by failing to otherwise give good reasons for assigning his opinions "little weight."[11] (Dkt. No. 13, at 16–20).

---

[11] The ALJ and both parties refer to Dr. Rybakov as a treating physician, and the Court therefore assumes Dr. Rybakov qualifies as a treating source under 20 C.F.R. § 404.1527(a)(2) for purposes of Plaintiff's appeal. However, the Court notes that, while the record indicates that Plaintiff was first evaluated by the clinic at which Dr. Rybakov works on August 8, 2012, Plaintiff's first documented visit with Dr. Rybakov was not until February 2, 2013, months after Plaintiff's DLI. (R. 622–25, 669–75); *see Monette v. Astrue*, 269 F. App'x 109, 112–13 (2d Cir. 2008) (summary

When evaluating the medical evidence in the record, "Social Security Administration regulations, as well as [Second Circuit] precedent, mandate specific procedures that an ALJ must follow in determining the appropriate weight to assign a treating physician's opinion." *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019). Because Plaintiff's claim was filed before March 27, 2017, these procedures include the treating physician rule. *See* 20 C.F.R. § 404.1527(a)(2).[12]

The "treating physician rule" requires that "the opinion of a claimant's treating physician as to the nature and severity of [an] impairment [be] given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Estrella*, 925 F.3d at 95 (quoting *Burgess*, 537 F.3d at 128). "Deference to such medical providers is appropriate" because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)" and "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations." *Barthelemy v. Saul*, No. 18-cv-12236, 2019 WL 5955415, at *8, 2019 U.S. Dist. LEXIS 196749, at *22 (S.D.N.Y. Nov. 13, 2019) (quoting 20 C.F.R. § 404.1527(c)(2)). If an ALJ decides not to give the treating source opinion controlling weight, then she must "'explicitly consider' the following, nonexclusive '*Burgess* factors': '(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining

---

order) (finding the treating physician rule did not apply to the retrospective opinion of a doctor who "was not a treating physician during the period in contention"). Dr. Rykabov's opinion, if uncontradicted, would nevertheless be "entitled to significant weight." *See Campbell v. Barnhart*, 178 F. Supp. 2d 123, 134 (D. Conn. 2001) (citations omitted).

[12] The Social Security Administration has revised how it considers and articulates medical opinions. *See* 20 C.F.R. § 404.1520c. Nonetheless, the regulations make clear that "[f]or claims filed before March 27, 2017, the rules in § 404.1527 apply," including the treating physician rule. *Id.*

medical evidence; and (4) whether the physician is a specialist.'" *Estrella*, 925 F.3d at 95–96

(quoting *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam)).

If an ALJ fails to assign a treating physician's opinion "controlling weight" and does not

explicitly consider the *Burgess* factors, this is "procedural error." *Id.* at 96; *see also Schaal v.*

*Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) ("Commissioner's failure to provide 'good reasons' for

apparently affording no weight to the opinion of plaintiff's treating physician constituted legal

error."). If the ALJ committed procedural error and has not provided "good reasons" for the

weight given to a treating physician's opinion, the court is "unable to conclude that the error was

harmless" and should "remand for the ALJ to 'comprehensively set forth [its] reasons.'" *Estrella*,

925 F.3d at 96 (quoting *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004)). "If, however, 'a

searching review of the record' assures [the court] 'that the substance of the treating physician

rule was not traversed,' [the court] will affirm." *Id.* (quoting *Halloran*, 362 F.3d at 32).

Here, the ALJ considered opinions from Dr. Rybakov from November 2015 and

November 2016. (R. 853–57, 1325–29). Dr. Rybakov's November 2016 opinion indicates that

the symptoms and limitations set forth therein "appl[ied] as far back as: 03/12/2016." (R. 1329).

The relevant time period in this case is from the disability onset date, August 1, 2009, (R. 360),

through Plaintiff's DLI, September 30, 2012, (*see* R. 303). The ALJ therefore found that this

2016 opinion "ha[d] no probative value regarding the claimant's limitations through the [DLI]

and is entitled to no weight." (R. 902). Plaintiff raises no argument specifically challenging the

ALJ's treatment of the November 2016 opinion, and the Court finds the ALJ did not err in

affording the opinion no weight. *Cf. Freund v. Berryhill*, No. 17-cv-9967, 2019 WL 1323992, at

*8, 2019 U.S. Dist. LEXIS 49535, at *28 (S.D.N.Y. Mar. 25, 2019) (finding no error in the

ALJ's decision to assign limited weight to the opinion of treating physicians that "nowhere

18

opine[d] that the specific functional limitations identified in their opinions predate[d]" the plaintiff's last eligibility date).

Dr. Rybakov's opinion from November 2015, however, states that the symptoms and limitations set forth therein had been present since August 1, 2009, Plaintiff's alleged onset date. (R. 857). As such, the ALJ was required to either assign Dr. Rybakov's opinion controlling weight or "explicitly consider" the *Burgess* factors. *Estrella*, 925 F.3d at 95–96. The ALJ assigned Dr. Rybakov's November 2015 opinion "little weight," (R. 902), and Defendant concedes that she did not explicitly articulate consideration of all the required *Burgess* factors, (*see* Dkt. No. 17, at 5).

Thus, the Court must determine whether the ALJ provided "good reasons" for assigning little weight to Dr. Rybakov's opinion. *Estrella*, 925 F.3d at 96. In this case, the ALJ explained that the opinion was entitled to "little weight" because it was "not supported by the medical evidence through the date last insured." (R. 902). The ALJ acknowledged that St. Mark's first evaluated Plaintiff in August 2012. (*Id.*). However, the ALJ noted that the record indicates that Plaintiff "entered treatment as a term of his parole, primarily for substance abuse." (*Id.*). Moreover, the initial evaluation and treatment notes from Dr. Nunez through September 2012 "show that the claimant reported good results from his medication with no specific complaints." (*Id.*). The ALJ further found that the limitations in Dr. Rybakov's opinion were not supported by Dr. Nunez's "detailed mental status examination" conducted in August 2012, which "showed no significant abnormality except for depressed mood." (*Id.*). Finally, the ALJ noted that, while the record indicates that Plaintiff received mental health and substance abuse treatment from December 2008 to September 2009, there are no treatment records from that period. (*Id.*).

The Court finds the ALJ articulated "good reasons" for assigning Dr. Rybakov's November 2015 opinion little weight. *Estrella*, 925 F.3d at 96. As an initial matter, the ALJ did not discount Dr. Rybakov's opinion merely because it was retrospective. A treating physician's retrospective opinion is entitled to controlling weight "unless it is contradicted by other medical evidence or overwhelmingly compelling non-medical evidence." *Reynolds v. Colvin*, 570 F. App'x 45, 48 (2d Cir. 2014) (summary order) (quoting *Byam v. Barnhart*, 336 F.3d 172, 183 (2d Cir. 2003)).[13] Rather, the ALJ determined that Dr. Rybakov's opinion was not supported by the medical evidence through Plaintiff's DLI. (R. 902). It is well-settled that a treating physician's opinion is not entitled to controlling weight where it is "contradicted by other substantial evidence in the record." *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (citations omitted). Here, the ALJ pointed to substantial evidence in the record which contradicted the "degree of limitations" expressed in Dr. Rybakov's opinion. (R. 902). Specifically, the ALJ noted that Plaintiff started treatment at St. Mark's in August 2012 because he was required to "do a substance abuse program for parole"; in other words, there is no evidence that Plaintiff sought treatment because he believed he needed mental health treatment. (R. 901 (citing R. 622), 902). The ALJ also found the "detailed mental status examination" performed by Dr. Nunez on August 8, 2012, which showed that Plaintiff had "depressed" mood but was otherwise entirely "within normal limits," to be inconsistent with Dr. Rybakov's opinion. (R. 901–02 (referring to R. 626–28)). Dr. Nunez observed that Plaintiff's attitude was "cooperative," he had "full" affect, he denied any danger to himself or others, his thought process was "logical," and his perception, thought content, cognition, insight, and judgment were within normal limits, with no impairment

---

[13] The Court acknowledges Defendant's argument that the Commissioner's 1991 regulations should take precedence over apparently conflicting Second Circuit caselaw. (Dkt. No. 17, at 11). However, the Second Circuit has restated the "overwhelmingly compelling" standard as recently as 2020. *See Riccobono v. Saul*, 796 F. App'x 49, 50 (2d Cir. 2020) (summary order).

identified as to memory, fund of knowledge, or attention/concentration. (R. 626–28); (*see also* R. 634–35 (noting on an October 5, 2012, "mini-mental status" exam that there were "no significant changes reported or observed")). Dr. Nunez's primary diagnosis for Plaintiff was alcohol dependence, with a secondary diagnosis of PTSD. (R. 901 (citing R. 623)). Dr. Nunez's records from a follow-up appointment on September 5, 2012, indicate that Plaintiff stated he was "doing better" and felt "his medication [was] working for him." (R. 629). On October 5, 2012 (after Plaintiff's DLI), Plaintiff complained of sexual side effects from his medication but otherwise was "doing well." (R. 634). These contemporaneous medical records contradict Dr. Rybakov's opined limitations for Plaintiff. *See, e.g.*, *Campbell v. Astrue*, 596 F. Supp. 2d 446, 452–53 (D. Conn. 2009) (finding no error in determining that a retrospective opinion was not entitled to controlling weight where it was "directly contradict[ed]" by "substantial medical and non-medical evidence" in the record); *Camacho v. Astrue*, No. 08-cv-6425, 2010 WL 114539, at *4, 2010 U.S. Dist. LEXIS 1184, at *11 (W.D.N.Y. Jan. 7, 2010) (affirming denial of benefits where there was "nothing in the medical record that suggests that Plaintiff was unable to perform a medium-level of work prior to his date last insured"); *cf. Gonzalez ex rel. Guzman v. Sec'y of U.S. Dep't of Health & Human Servs.*, 360 F. App'x 240, 243–45 (2d Cir. 2010) (summary order) (finding, "[i]n the absence of any medically objective evidence," that the claimant was not per se disabled prior to his date last insured).

The ALJ gave additional reasons for affording Dr. Rybakov's opinion little weight. The ALJ noted that, although the record indicates that Plaintiff received some form of mental health treatment from December 2008 to September 2009, (*see* R. 1347), there are no treatment records from that time period. (R. 902). Elsewhere in her decision, the ALJ noted that Plaintiff's incarceration records, which span approximately from August 2010 to June 2012, indicate that

Plaintiff "did receive some mental health treatment," including medications aimed at treating depression and anxiety. (R. 901 (citing R. 440, 446); *see generally* R. 438–75). However, the records "do not show any specific discussion of symptoms, mental status examinations, or other evidence regarding the nature of the claimant's impairments other than acknowledging he was receiving treatment." (R. 901). Finally, the ALJ noted that "[t]he only other evidence regarding the claimant's treatment for mental impairments during the period at issue consists of letters from various providers without any supporting evidence." (R. 901 (citing R. 1347, 1349, 1350, 1516)). The lack of any indication in Plaintiff's incarceration records regarding symptoms or impairments which might bear on Plaintiff's work-related abilities, coupled with the contemporaneous mental status exams by Dr. Nunez, which are inconsistent with Dr. Rybakov's opinion that Plaintiff suffered disabling limitations as a result of his mental impairments, constitute substantial evidence in the record contradicting Dr. Rybakov's opinion. *See Reynolds*, 570 F. App'x at 47 ("A lack of supporting evidence on a matter where the claimant bears the burden of proof, particularly when coupled with other inconsistent record evidence, can constitute substantial evidence supporting a denial of benefits." (citing *Talavera v. Astrue*, 697 F.3d 145, 153 (2d Cir. 2012))).

Plaintiff argues that Dr. Rybakov's opinions are supported by appropriate medical findings because "[r]ecords from prior to the date last insured confirm that [Plaintiff] had symptoms of PTSD, as well as feeling confused, anxious, tense, and depressed." (Dkt. No. 13, at 18 (citing R. 622, 629–33)). As Defendant points out, these records refer to symptoms Plaintiff reported or complained of to Dr. Nunez. (Dkt. No. 17, at 14; *see also* R. 622 (noting that "Patient . . . reports having a history of PTSD" and "[complains of] feeling 'confused', anxious, tense, depressed")). A provider may, in some circumstances, rely on a patient's "report of complaints,

or history," as an "essential diagnostic tool." *Green-Younger*, 335 F.3d at 107 (quoting *Flanery v. Chater*, 112 F.3d 346, 350 (8th Cir. 1997)). However, Plaintiff's reported symptoms and history of PTSD do not themselves suggest that Plaintiff suffered functional limitations to the extent opined by Dr. Rybakov, much less that he was unable to work at that time. *See Behling v. Comm'r of Social Sec.*, 369 F. App'x 292, 294 (2d Cir. 2010) (summary order) ("While it is true that 'subjective evidence of pain or disability testified to by the claimant' is relevant in evaluating a claim for disability insurance," a claimant's "subjective complaints alone are not a basis for an award of disability insurance benefits in the absence of corroborating objective medical evidence." (citations omitted)).[14] Accordingly, in finding Dr. Rybakov's opinion inconsistent with the medical evidence in the record, the ALJ provided a good reason for discounting the opinion.

Finally, Plaintiff also argues that the fact that he showed some positive response to treatment during the relevant time period fails to contradict Dr. Rybakov's opinions because the ALJ failed to consider the longitudinal medical record. (*See* Dkt. Nos. 13, at 19; 20, at 4–5). However, the ALJ "note[d] that the record does reflect that [Plaintiff] began experiencing increased anger, anxiety, emotional lability, and other symptoms," but that this increase "occurred after" his DLI. (R. 902 (citing R. 639)). She further stated that Plaintiff must "establish work-related limitations through the date last insured, and the available evidence relevant to this period shows a generally normal mental status examination and the claimant reporting

---

[14] Plaintiff also cites to cases which rely on a provider's mental status examination as an essential diagnostic tool. (Dkt. No. 13, at 19 (first citing *Polis v. Astrue*, No. 09-cv-379, 2010 WL 2772505, at *10, 2010 U.S. Dist. LEXIS 70199, at *28 (E.D.N.Y. July 13, 2010) (acknowledging that a psychiatrist may not be able to do more than "review the patient's history, conduct a mental status examination," and report the results) (citation omitted); and then citing *Regan v. Astrue*, No. 09-cv-2777, 2010 WL 1459194, at *11, 2010 U.S. Dist. LEXIS 35811, at *39–40 (E.D.N.Y. Apr. 12, 2010) (noting that mental status examination results may properly support a treating source opinion)). However, as discussed above, the mental status examination in the record from the relevant time period found that Plaintiff had depressed mood but was otherwise within normal limits.

improvement with no specific complaint of symptoms through September 30, 2012." (*Id.*). The ALJ therefore did consider records from after the relevant time period and the trajectory of Plaintiff's symptoms. However, those records do not adequately shed light on Plaintiff's limitations during the relevant time period. *See Clark v. Saul*, 444 F. Supp. 3d 607, 621 (S.D.N.Y. 2020) ("[F]or [records post-dating the DLI] to provide substantial evidence of a disability during the relevant time period, the records must actually shed light on [the plaintiff's] condition during that period."). Without showing that he had limitations rendering him unable to work prior to the DLI, Plaintiff is not entitled to SSDI benefits. *See Mauro v. Berryhill*, 270 F. Supp. 3d 754, 762–63 (S.D.N.Y. 2017) (noting that, "when a claimant does not show that a currently existing condition rendered her disabled prior to her date last insured, benefits must be denied" and holding that provider letters opining as to the presence of cancer prior to the plaintiff's DLI were not material evidence because "the issue before the ALJ was not whether cancer was present prior to the date last insured but rather whether the cancer rendered her *unable to work* at that time"); *Camacho*, 2010 WL 114539, at *4, 2010 U.S. Dist. LEXIS 1184, at *11 ("The seriousness of Plaintiff's [impairment] after his date last insured is not disputed[;] however, it cannot qualify Plaintiff for DIB unless he was disabled prior to his date last insured." (citation omitted)).

In sum, the Court finds that the ALJ gave good reasons for affording Dr. Rybakov's November 2015 opinion little weight and that the substance of the treating physician rule was not traversed.[15]

---

[15] The Court acknowledges that, in certain situations, remand is warranted for an opportunity to more fully develop the record where the ALJ fails "to properly consider the possibility of retrospective diagnosis by a treating physician." *E.g.*, *Fazio v. Comm'r of Soc. Sec.*, 408 F. Supp. 3d 240, 248 (E.D.N.Y. 2019). Here, however, the ALJ did not ignore the retrospective nature of the opinions at issue, and Plaintiff makes no argument that the record is otherwise insufficiently developed. Indeed, Plaintiff acknowledges that "it is unlikely that any further evidence relevant to the period could be produced." (Dkt. No. 13, at 27).

####       b.       Social Worker Bliss

Plaintiff next challenges the ALJ's decision to afford "little weight" to the opinion of Mr.

Bliss. (Dkt. No. 13, at 17–18, 20–21).

As an initial matter, Mr. Bliss, as a licensed clinical social worker, is not an "acceptable

medical source" under the regulations applicable to Plaintiff's claim. *See* 20 C.F.R.

§ 404.1502(a) (defining "acceptable medical source"); *Martino v. Comm'r of Soc. Sec.*, 339 F.

Supp. 3d 118, 128 (W.D.N.Y. 2018) (noting that a licensed clinical social worker is not an

"acceptable medical source," but rather an "other" medical source). Accordingly, the opinion of

a licensed clinical social worker is not entitled to controlling weight. *Martino*, 339 F.3d at 128.

An ALJ must "consider" opinions from other medical sources. *See* 20 C.F.R. § 404.1527(f)(1)

(the agency "will consider" opinions from other medical sources "using the same factors"

considered for the opinion of an acceptable medical source). Furthermore, an ALJ "generally

should explain the weight given to opinions" from other medical sources. *Id.* § 404.1527(f)(2);

*see also* Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939, at *6, 2006 SSR LEXIS 5,

at *15–16 (Aug. 9, 2006) (same). However, an ALJ is "not required to weigh the assessment of

an 'other medical source' at all." *Ross v. Colvin*, No. 13-cv-755, 2014 WL 5410327, at *16, 2014

U.S. Dist. LEXIS 150375, at *39–40 (N.D.N.Y. Sept. 29, 2014) (citations omitted), *report-

recommendation adopted by* 2014 WL 5410327, 2014 U.S. Dist. LEXIS 149462 (Oct. 21, 2014).

Here, although the ALJ was not required to weigh Mr. Bliss's opinion that Plaintiff had

marked limitations in most mental activities at all, she considered his opinion and ultimately

afforded it "little weight." (R. 903).[16] The ALJ first noted that the "first documented evaluation"

---

[16] To the extent Plaintiff argues that the ALJ erred in failing to give weight to the opinions in the record that Plaintiff was "disabled" or "unable to work," (*e.g.*, R. 587, 593, 1286, 1510), the Court rejects that argument. *See Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (noting that the "ultimate finding of whether a claimant is disabled and cannot work" is "reserved to the Commissioner" (quoting 20 C.F.R. § 404.1527(e)(1))).

of Plaintiff by Mr. Bliss occurred on October 15, 2012. (R. 902; *see* R. 482–91). At that time,

Plaintiff's presenting problem was an "extensive drug/alcohol history." (R. 482). Although Mr.

Bliss noted that Plaintiff had PTSD, the ALJ observed that the evaluation contained "no specific

complaints of PTSD, depression, or other symptoms." (R. 903). The ALJ further noted that the

mental status examination conducted by Mr. Bliss showed "impaired" judgment but was

otherwise within normal limits. (*Id.*).[17] Finally, the ALJ stated that Mr. Bliss's treatment reports

"do not reflect review of any other medical evidence generated prior to his initial evaluation, and

relied on the claimant's own statements regarding his psychiatric history." (*Id.*). Accordingly, the

ALJ determined that Mr. Bliss's opinion had "no probative value in determining the claimant's

work-related limitations through the date last insured as he did not begin treating claimant until

after this period." (*Id.*).

      For similar reasons discussed above in connection with Dr. Rybakov's opinion, the Court

finds that substantial evidence supports the ALJ's decision to afford Mr. Bliss's opinion little

weight. The ALJ did not discount the opinion of Mr. Bliss solely because it was retrospective.

Rather, she found his opinions regarding Plaintiff's limitations prior to the DLI, September 30,

2012, unsupported, as Mr. Bliss, who began treating Plaintiff in October 2012, (*see* R. 482–91),

did not review medical evidence prior to that time. *Cf. Martino*, 339 F. Supp. 3d at 129 (finding

that the ALJ "adequately explained" his reasoning for assigning little weight to the opinion of a

licensed clinical social worker where it was "not well supported by the treatment record or

objective medical evidence"). Finally, Mr. Bliss's opinion was not consistent even with the

evaluation he conducted of Plaintiff on October 15, 2012, shortly after the DLI. (*See* R. 902–03).

And, as the ALJ noted, the mental status examination conducted by Mr. Bliss found Plaintiff

---

[17] In fact, the record indicates that Mr. Bliss found Plaintiff's judgment to be "intact." (R. 490).

within normal limits, a finding inconsistent with marked limitations. (*Id.*; *see also* R. 489–90 (finding "cooperative" attitude; activity "within normal range"; "even" mood; "normal" speech pattern; "intact" thought content, attention/concentration, short- and long-term memory, and judgment; "adequate" insight; "goal directed" thought processes; no suicidal ideation, intent, or plan; and orientation to time, place, and person; but a history of violence).

Accordingly, the Court finds that substantial evidence supports the ALJ's decision to afford Mr. Bliss's opinion little weight.

### c.   Dr. Sherman

As part of his argument that the ALJ failed to properly weigh the medical opinion evidence, Plaintiff refers to the ALJ's decision to give "no weight" to the opinion of Dr. Sherman, who examined Plaintiff in 2016, and refers generally to the ALJ's treatment of the "opinions from treating and examining sources." (Dkt. No. 13, at 17). However, Plaintiff does not develop any distinct argument regarding Dr. Sherman's opinion in particular. (*See* Dkt. Nos. 13, at 16–22; 20, at 2–8).

The Court finds that substantial evidence supports the ALJ's decision to afford Dr. Sherman's opinion no weight.[18] The ALJ noted that Dr. Sherman evaluated Plaintiff on September 18, 2016, at the request of Plaintiff's counsel. (R. 903 (citing R. 1288–90)). The ALJ's review of Dr. Sherman's report indicated that Plaintiff's "medical history was obtained completely through subjective accounting by the claimant," and there was "no indication Dr. Sherman had the opportunity to personally review any medical evidence, particularly through the date last insured." (*Id.*). Accordingly, the ALJ concluded that Dr. Sherman "had no medical

---

[18] As Dr. Sherman evaluated Plaintiff on one occasion, he is not a treating source whose opinion is subject to the treating physician rule. *See* 20 C.F.R. § 404.1527(a)(2).

basis" on which to conclude that Plaintiff's limitations, as expressed in his medical source statement, applied back as far as August 1, 2009. (*Id.*). In sum, the ALJ determined that Dr. Sherman's opinion was entitled to no weight because "it [was] based on a single examination of the claimant approximately four years after the date last insured and has no probative value for establishing the claimant's work-related limitations through September 30, 2012." (*Id.*).

As with the opinions of Dr. Rybakov and Mr. Bliss, the ALJ did not discount Dr. Sherman's opinion merely because it was retrospective. Rather, she pointed out that Dr. Sherman evaluated Plaintiff only once, a proper factor to consider under the regulations. *See* 20 C.F.R. § 404.1527(c)(1)-(2). She also determined that Dr. Sherman had not reviewed any of Plaintiff's medical history. *Cf. Edel v. Astrue*, 06-cv-440, 2009 WL 890667, at *23, 2009 U.S. Dist. LEXIS 131625, at *70–71 (N.D.N.Y. Feb. 10, 2009) (recognizing that some evaluations conducted after the relevant time period will be more probative than others, particularly when subsequent opinions "had additional medical signs or laboratory findings upon which they based their conclusions," and concluding that a doctor's opinion based on her review of the plaintiff's medical records, her examination of the plaintiff, and a blood test would be more probative than an opinion based "only" on an examination of the plaintiff and where the plaintiff gave false information), *report-recommendation adopted by* 2009 WL 890667, 2009 U.S. Dist. LEXIS 26270 (Mar. 30, 2009). Additionally, as with the other opinions, Dr. Sherman's opinion is inconsistent with the medical evidence in the record from the relevant time period. *See supra* Section III.B.1.a.-b.

Accordingly, the Court finds that substantial evidence supports the ALJ's decision to afford Dr. Sherman's opinion no weight.

d.      **Plaintiff's RFC**

Plaintiff next argues that the ALJ "failed to identify any evidence that supports" the RFC

determination. (Dkt. 13, at 21–22). The cases Plaintiff cites in support of this argument stand for

the proposition that an ALJ may not substitute her own opinion for that of a physician and that an

RFC determination must be supported by a medical opinion. *See, e.g.*, *Legall v. Colvin*, No. 13-

cv-1426, 2014 WL 4494753, at *4, 2014 U.S. Dist. LEXIS 113952, at *13–14 (S.D.N.Y. Aug.

13, 2014) ("[B]ecause an RFC determination is a medical determination, an ALJ who makes an

RFC determination in the absence of supporting expert medical opinion has improperly

substituted his [or her] own opinion for that of a physician, and has committed legal error."

(quoting *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 347 (E.D.N.Y. 2010)), *report-*

*recommendation adopted by* 2010 WL 4494753, 2014 U.S. Dist. LEXIS 126670 (Sept. 10,

2014). Defendant responds that an ALJ may properly analyze medical records to assess their

weight, and Plaintiff has not identified any "raw medical data" that the ALJ improperly

interpreted. (Dkt. No. 17, at 18 (citing *Rhondalee T. v. Berryhill*, No. 17-cv-1241, 2019 WL

1100267, at *9, 2019 U.S. Dist. LEXIS 37459, at *27–28 (N.D.N.Y. Mar. 8, 2019))).

Although the ALJ must "consider opinions from medical sources on issues such as . . . [a

claimant's] residual functional capacity," the "final responsibility" for deciding a claimant's RFC

"is reserved to the Commissioner." 20 C.F.R. § 404.1527(d)(2). Accordingly, the Second Circuit

has stated that "a medical source statement or formal medical opinion is not necessarily

required" for there to be substantial evidence supporting an RFC determination. *Monroe v.*

*Comm'r of Soc. Sec.*, 676 F. App'x 5, 8 (2d Cir. 2017) (summary order) (rejecting the argument

that the ALJ's RFC determination was not supported by substantial evidence because the ALJ

rejected the doctor's opinion and therefore "there was no competent medical opinion that

supported the ALJ's RFC determination"); *see also Ross v. Colvin*, No. 14-cv-444, 2015 WL

4891054, at *5, 2015 U.S. Dist. LEXIS 108153, at *13–14 (W.D.N.Y. Aug. 17, 2015) ("[I]t is

not per se error for an ALJ to make the RFC determination absent a medical opinion.") (citations

omitted). Rather, the ALJ is "entitled to weigh all of the evidence available to make a residual

functional capacity finding that [is] consistent with the record as a whole." *Trepanier v. Comm'r*

*of Soc. Sec. Admin.*, 752 F. App'x 75, 79 (2d Cir. 2018) (summary order) (citing *Schaal*, 134

F.3d at 504).

  Here, in explaining her RFC determination, the ALJ considered and discussed the

medical evidence, opinion evidence, and non-medical evidence in the record. (*See* R. 899–903).

As discussed above and below, the Court finds that substantial evidence supports the ALJ's

weighing of the opinion evidence and evaluation of Plaintiff's subjective statements. The ALJ

afforded little weight to Dr. Rybakov's November 2015 opinion and Mr. Bliss's opinions, and

then weighed all of the evidence in the record to formulate an RFC. *See Trepanier*, 752 F. App'x

at 79. The ALJ cited to "diagnoses of substance abuse, depression, and PTSD through the date

last insured, but with positive response to treatment." (R. 903; *see also* R. 629 (Plaintiff reporting

on September 5, 2012 that he was "doing better" and felt that "his medication [was] working for

him")). Accordingly, she limited Plaintiff's RFC to "simple, repetitive jobs involving no more

than one or two tasks; he could perform 'low stress' work, defined as having no more than

occasional decision-making required or occasional changes in the work setting; he could tolerate

occasional interaction with the public or coworkers, but could not work in tandem with

coworkers." (R. 899–900). This RFC indicates that the ALJ adopted the limitations identified in

the opinions of Dr. Rybakov and Mr. Bliss, (*see* R. 856 (Dr. Rybakov opining that Plaintiff had a

"moderate-to-marked" limitation in carrying out "simple, one-to-two step instructions" and

making "simple work-related decisions" and a "marked" limitation in interacting with the public

and coworkers), 592 (Mr. Bliss opining that Plaintiff had a "marked" limitation in carrying out

"simple, one-to-two step instructions," making "simple work-related decisions," and interacting

with coworkers and a "moderate-to-marked limitation" in "[i]nteracting with the public"), but

rejected their opinions as to level of severity, in part, based on Plaintiff's statement during the

relevant time period that he was "doing better" and his medication was effective, (R. 629). Here,

because the ALJ properly weighed the opinion and medical evidence from the relevant time

period, as well as Plaintiff's own statements, in formulating the RFC, the Court finds Plaintiff's

assertion that the ALJ substituted her own opinion for that of a physician to be without merit. *See*

*Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order) (disagreeing with the

plaintiff's assertion that the ALJ substituted his own medical judgment for expert opinions of,

inter alia, marked limitations, in concluding that "substantial evidence revealed [plaintiff's]

condition stabilized and at the most, he had moderate symptoms," explaining that "[a]lthough the

ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited

in his decision, he was entitled to weigh all of the evidence available to make an RFC finding

that was consistent with the record as a whole"). Accordingly, the Court finds that substantial

evidence supports the ALJ's determination that Plaintiff's mental impairments did not produce

any limitations above those incorporated into his RFC. *Cf. Price v. Comm'r of Soc. Sec.*, No. 18-

cv-219, 2020 WL 4288247, at *6, 2020 U.S. Dist. LEXIS 132644, at *17 (W.D.N.Y. July 27,

2020) (finding "substantial evidence supported the ALJ's determination [that] Plaintiff's mental

impairments did not cause any additional mental limitations that would preclude unskilled

work").

### 2.    Plaintiff's Subjective Statements

        Plaintiff argues that the ALJ's evaluation of his subjective statements is not supported by

substantial evidence. (Dkt. No. 13, at 22–25).

In determining a claimant's RFC, the ALJ must consider, in addition to the objective evidence, the claimant's "subjective symptoms," including "pain and descriptions of other limitations." *Lisa R. v. Comm'r of Soc. Sec.*, No. 18-cv-763, 2020 WL 210273, at *4, 2020 U.S. Dist. LEXIS 5796, at *11 (N.D.N.Y. Jan. 14, 2020) (citing 20 C.F.R. §§ 404.1545, 416.945). The ALJ "is not required to accept the claimant's subjective complaints without question" and may "exercise discretion in weighing . . . the claimant's testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979)).

The ALJ employs a two-step process to evaluate the claimant's reported symptoms: (1) the ALJ determines if the claimant has medically determinable impairments that could produce the alleged systems; and (2) if the impairments do exist, the ALJ evaluates the intensity, persistence, and limiting effects of the symptoms to determine the extent to which the symptoms limit the claimant's ability to work. *See* 20 C.F.R. § 404.1529(a); *Genier*, 606 F.3d at 49. In so doing, the ALJ considers factors such as the claimant's "daily activities"; the "type, dosage, effectiveness, and side effects of any medication" the claimant takes or has taken to relieve his pain or other symptoms; and "[t]reatment, other than medication," the claimant receives or has received for relief of the pain or other symptoms. 20 C.F.R. § 404.1529(c)(3). "After considering the objective medical evidence, the claimant's demeanor and activities, subjective complaints, as well as any inconsistencies between the medical evidence and the claimant's subjective complaints, an ALJ may accept or disregard the claimant's subjective testimony as to the degree of impairment." *Pidkaminy v. Astrue*, 919 F. Supp. 2d 237, 249 (N.D.N.Y. 2013).

Here, the ALJ applied the two-step process and found that while Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms,"

Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. 900). More specifically, the ALJ noted that Plaintiff's "allegations are only partially consistent with the medical evidence." (R. 903). As to Plaintiff's mental impairments, the ALJ concluded:

> [T]he record does not contain sufficient evidence to corroborate his allegations regarding his symptoms. While the record does show that he did receive treatment from December 2008 to September 2009, one month after his alleged onset date, this was primarily regarding his substance abuse. The claimant later entered treatment upon release from incarceration for substance abuse, and reported good response to medication through the date last insured. The claimant also received treatment while incarcerated, but the specific nature of the treatment, other than his medications, are not discussed in the provided records. There is no indication that the claimant reported to a treating source the type of panic attacks, agoraphobia, or paranoia alleged at the hearing through the date last insured.

(*Id.*).

The Court finds that substantial evidence supports the ALJ's evaluation of Plaintiff's subjective statements. After discussing the medical and opinion evidence in the record, the ALJ concluded that Plaintiff's statements were not consistent with that evidence. Although a plaintiff's statements about pain and other symptoms may not be rejected "solely because the available objective medical evidence does not substantiate" them, 20 C.F.R. § 404.1529(c)(2), here the ALJ considered other factors outlined in Section 404.1529(c)(3). Specifically, the ALJ considered Plaintiff's medications, course and history of treatment for his mental impairments, and his responses thereto. *See id.* § 404.1529(c)(3)(iv), (v). Regarding Plaintiff's history of treatment, the ALJ noted that Plaintiff received treatment primarily regarding his substance abuse from December 2008 to September 2009. (R. 903; R. 1347 (noting that Plaintiff was in a treatment program for "dually diagnosed individuals with mental illness and chemical

addiction"), 1349 (counselor from program noting that Plaintiff was "referred to our program from the halfway house for addicts within our organization" and that he "was seen twice a week for counseling and to assess his mental state and sobriety" and "attended AA meetings" and "group meetings" "and "worked diligently to maintain his mental health and sobriety")). However, he did not begin regular treatment for his mental impairments until August 2012, approximately two months before the DLI. (*See* R. 901, 903, 618–28 (treatment notes dated August 8, 2012), 629–33 (treatment notes dated September 5, 2012)). While the failure of a claimant to seek medical treatment is "not a defense to a claim for disability benefits," it can "cast doubt upon the seriousness" of reported impairments. *Barringer v. Comm'r of Soc. Sec.*, 358 F. Supp. 2d 67, 82 n.28 (N.D.N.Y. 2005) (citations omitted). The ALJ also considered Plaintiff's medications and the fact that they were effective through the DLI, both proper factors to consider. (R. 903, 629 (Plaintiff reporting on September 5, 2012 that he was "doing better" and felt that "his medication [was] working for him")); *see* 20 C.F.R. § 404.1529(c)(3)(iv); *Barringer*, 358 F. Supp. 2d at 82 (finding the ALJ properly evaluated and disregarded the plaintiff's subjective complaints after considering her daily activities, medications, and treatment history).

In sum, the Court finds substantial evidence supports the ALJ's evaluation of Plaintiff's subjective statements. *See also Snyder v. Saul*, 840 F. App'x 641, 644 (2d Cir. 2021) (summary order) (recognizing the "deferential standard of review" of an ALJ's evaluation of subjective statements).

### 3.   Conflicts Between the VE's Testimony and the *DOT*

Plaintiff argues that the ALJ failed to resolve apparent conflicts between the RFC determination limiting him to "simple, repetitive jobs involving no more than one or two tasks" and the testimony of the VE that a hypothetical person with Plaintiff's RFC could perform jobs

requiring a reasoning level of two (as defined by the *DOT*). (Dkt. No. 13, at 25–27). Defendant

responds that there is no conflict between an RFC limitation to simple work and a reasoning

level of two. (Dkt. No. 17, at 21–24).

The Second Circuit has made clear that an ALJ has an "affirmative obligation" to identify

and resolve "apparent conflicts" between the *DOT* and VE testimony. *Lockwood v. Comm'r of*

*Soc. Sec. Admin.*, 914 F.3d 87, 93–94 (2d. Cir. 2019) (citing, *inter alia*, SSR 00-4p, 2000 WL

1898704, at *1, 2000 SSR LEXIS 8, at *1 (Dec. 4, 2000) ("[O]ur adjudicators must: Identify and

obtain a reasonable explanation for any conflicts between occupational evidence provided by

VEs . . . and information in the Dictionary of Occupational Titles.")). An ALJ may not satisfy

this obligation by asking the VE the "catch-all" question of whether his testimony is consistent

with the *DOT*. *See id.*[19] However, an ALJ's "failure to follow SSR 00-4p where there is no

conflict between the expert's opinion and the DOT" is harmless error. *Edwards v. Astrue*, No.

07-cv-898, 2010 WL 3701776, at *14, 2010 U.S. Dist. LEXIS 96830, at *45 (N.D.N.Y. Sept. 16,

2010) (citing *Massachi v. Astrue*, 486 F.3d 1149, 1154 n.9 (9th Cir. 2007)).

Here, there was no actual or apparent conflict between the VE's testimony and the *DOT*

for the ALJ to identify and resolve. Each of the three jobs identified by the VE requires a

reasoning level of two. *See DOT*, Router, Code 222.587-038, 1991 WL 672123; *DOT*, Classifier,

Code 361.687-014, 1991 WL 672991; *DOT*, Marker, Code 209.587-034, 1991 WL 671802.[20]

The *DOT* defines a reasoning level of two to require the following: "Apply commonsense

understanding to carry out detailed but uninvolved written or oral instructions. Deal with

---

[19] Here, the ALJ asked the VE at the beginning of her testimony whether her testimony would be consistent with the *DOT* and if not, whether she would advise the ALJ of the inconsistency and how it was resolved. (R. 953). The VE answered in the affirmative. (*Id.*).

[20] No Lexis cite is available for *DOT* entries.

problems involving a few concrete variables in or from standardized situations." *DOT*, Appendix

C—Components of the Definition Trailer, 1991 WL 688702.

Plaintiff argues that the requirements of reasoning level two are inconsistent with the

RFC determination limiting him to simple work with only one-to-two step tasks, and that an

individual limited to one-to-two step tasks would only be able to perform a job with a reasoning

level of one. (Dkt. No. 13, at 26); *see also DOT*, Appendix C, 1991 WL 688702 (defining

reasoning level of one to require applying "commonsense understanding to carry out simple one-

or-two step instructions"). However, Plaintiff misstates the ALJ's RFC determination: the ALJ

did not limit Plaintiff to carrying out one-to-two-step instructions, or even to one-to-two step

tasks. (*See* R. 899–900). Rather, she limited Plaintiff to "simple, repetitive jobs involving no

more than *one or two tasks*." (*Id.* (emphasis added)). Accordingly, Plaintiff is incorrect that the

ALJ's RFC determination would necessarily limit him to jobs with a reasoning level of one, and

the cases he cites are distinguishable. *See, e.g.*, *Pettaway v. Colvin*, No. 12-cv-2914, 2014 WL

2526617, at *12, 2014 U.S. Dist. LEXIS 76938, at *33 (E.D.N.Y. June 4, 2014) (finding a

conflict between jobs with a reasoning level of two and an RFC limited to the ability to "follow

and understand *simple directions and instructions* and perform simple tasks independently"

(emphasis in original)); *Day v. Astrue*, No. 09-cv-131, 2011 WL 1467652, at *17–18, 2011 U.S.

Dist. LEXIS 41738, at *49–51 (E.D.N.Y. Apr. 18, 2011) (finding a conflict where the claimant

was limited to "simple, repetitive-type tasks" and the VE identified only jobs with a reasoning

level of *three*).

Moreover, "a growing number of courts have held that jobs with DOT reasoning levels of

two or three are compatible with limitations to simple, routine work." *Haiss v. Berryhill*, No. 17-

cv-8083, 2019 WL 3738624, at *11, 2019 U.S. Dist. LEXIS 83158, at *36–37 (S.D.N.Y. May

15, 2019) (collecting cases); *Jones-Reid v. Astrue*, 934 F. Supp. 2d 381, 408 (D. Conn. 2012)

(noting that many courts have found that "a limitation of simple tasks or instructions is consistent

with GED level 2 reasoning"), *aff'd*, 515 F. App'x 32 (2d Cir. 2013); *Edwards*, 2010 WL

3701776, at *15, 2010 U.S. Dist. LEXIS 96830, at *45 ("Working at reasoning level 2 does not

contradict a mandate that work be simple, routine and repetitive.") (citations omitted); *Carrigan*

*v. Astrue*, No. 10-cv-303, 2011 WL 4372651, at *10, 2011 U.S. Dist. LEXIS 109460, at *31–32

(D. Vt. Aug. 26, 2011) (same) (collecting cases). Indeed, some courts hold there is no conflict

between simple, routine, repetitive tasks and a reasoning level of three, which is more

demanding than a reasoning level of two. *See, e.g.*, *Race v. Comm'r of Soc. Sec.*, No. 14-cv-

1357, 2016 WL 3511779, at *7, 2016 U.S. Dist. LEXIS 80855, at *20–21 (N.D.N.Y. May 24,

2016) (noting courts have found that jobs with reasoning levels of three "are compatible with

limitations to simple and low stress work" and collecting cases), *report-recommendation adopted*

*by* 2016 WL 3512217, 2016 U.S. Dist. LEXIS 80854 (N.D.N.Y. June 22, 2016); *Michael C. v.*

*Comm'r of Soc. Sec.*, No. 17-cv-920, 2018 WL 4689092, at *3–4, 2018 U.S. Dist. LEXIS

167509, at *10–11 (N.D.N.Y. Sept. 28, 2018).

      Accordingly, the Court finds there was no conflict between Plaintiff's RFC determination

limiting him to "simple, repetitive jobs involving no more than one or two tasks" and the VE's

testimony that he would be able to perform jobs with a reasoning level of two. *E.g.*, *Edwards*,

2010 WL 3701776, at *15, 2010 U.S. Dist. LEXIS 96830, at *45. Because there is no conflict,

any failure on the part of the ALJ to comply with the mandates of SSR 00-4p was harmless error.

*Edwards*, 2010 WL 3701776, at *14, 2010 U.S. Dist. LEXIS 96830, at *45.

## IV.   CONCLUSION

      For these reasons, it is hereby

      **ORDERED** that the decision of the Commissioner is **AFFIRMED**; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

Dated: <u>September 22, 2021</u>
Syracuse, New York

Brenda K. Sannes
U.S. District Judge